**Affirmed and Memorandum Opinion filed January 16, 2020.**



In The

# Fourteenth Court of Appeals

### NO. 14-19-00603-CV

## IN THE INTEREST OF R.R., JR. A CHILD

**On Appeal from the 387th District Court
Fort Bend County, Texas
Trial Court Cause No. 18-DCV-253527**

## MEMORANDUM OPINION

Appellant R.R. ("Father") appeals the trial court's final decree terminating parental rights to his son, R.R., Jr. ("Ryan")[1] and appointing the Texas Department of Family and Protective Services (the Department) as sole managing conservator of Ryan. The trial court terminated Father's parental rights on predicate grounds of endangerment, failure to complete a family service plan, and conduct that resulted in conviction and imprisonment for not less than two years and an inability

---

[1] We use pseudonyms to refer to appellant, the children, and other family members. *See* Tex. Fam. Code § 109.002(d); Tex. R. App. P. 9.8.

to care for the child.  *See* Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), and (Q). The trial court further found that the termination of Father's rights was in the child's best interest. Tex. Fam. Code § 161.001(b)(2).  The Father challenges the legal and factual sufficiency of the evidence to support the trial court's findings on all predicate grounds and that termination is in the child's best interest.  Because we conclude the evidence is legally and factually sufficient to support the trial court's judgment, we affirm.

## I.    BACKGROUND

### A.    The Department's Pretrial Removal Affidavit

In July 2018, when Ryan was twenty-two months old, the Department received a referral alleging Ryan's mother ("Mother") was neglectful in supervising Ryan. Specifically, the referral stated that Mother and another woman, Father's cousin, were selling drugs, including crack, cocaine, hydrocodone, and marijuana out of their home. The two women were also alleged to have been conducting a prostitution business out of their home. These activities were allegedly occurring in the presence of Ryan and the cousin's children. It was further alleged that Mother hit Ryan with her open hand and a belt, causing him injuries. The report also stated Ryan was left outside unsupervised and that there was no food in the home.

Upon receipt of this referral, a Department investigator met with Mother. Mother said she had three other children of whom she lost custody. Mother explained that she was charged with child endangerment in 2013 and that she was diagnosed with bipolar disorder, depression, post-traumatic stress disorder, psychosis, and insomnia. Mother said Father was incarcerated. Mother agreed to submit to drug tests. The drug test returned positive for marijuana and phencyclidine (PCP). In her affidavit, the caseworker averred that the Department

2

could not locate any family members or contacts who were willing to care for Ryan—this was later disputed at trial by Father's cousin and his girlfriend. The trial court appointed the Department temporary sole managing conservator of Ryan. The Department placed Ryan with his current foster family shortly after he was removed from Mother's home.

## B.    Trial Testimony

Trial commenced eleven months after the Department removed Ryan from Mother's care.

### 1.    Father

Father testified that he had been incarcerated for over two years at the time of trial. Ryan was eight months old when Father went into prison. Father further testified that he was incarcerated as the result of pleading guilty to two separate charges. He entered a plea of guilty to a family violence assault charge against Mother. This charge stemmed from an incident alleged to have occurred in April 2016, at which time Mother was pregnant with Ryan. Father admitted he pled guilty to assaulting Mother but denied the assault happened. Father claimed he entered the guilty plea to the charge of assaulting Mother in order to reduce his sentence on his guilty plea to evading arrest, which was allegedly committed after Ryan was born.

When asked how many times he had been charged with domestic assault, Father responded that he could not remember, but said he had been to prison for domestic assault three times. Father confirmed that he had prior domestic assault charges from: (1) 2004, against his sister, (2) 2006, two counts against an ex-girlfriend, and (3) 2009, against another ex-girlfriend.

3

Father also confirmed that he had been charged with evading arrest, drug possession, burglary, criminal mischief, and assault causing bodily injury. Father testified that he has been in and out of jail for the last twenty-one years and estimated he had been incarcerated for "a little over fourteen years" cumulatively.

Father testified that he was "hurt" when he found out that Ryan had been taken into Department custody. According to Father, he has been doing everything he can from prison to comply with the trial court's orders to get his son back and was not notified until March or April regarding the possibility of family member placement for Ryan. Father explained that if he is not paroled, then he has twenty months left on his sentence.

Father testified that Mother was sober while they were living together. Father confirmed that he was aware that Mother had a history with the Department, and that her three other children had been removed from her custody. Father knew Mother suffered from numerous mental health conditions, including bipolar disorder and depression, as well as seizure disorder, and testified that while they were together Mother did not consistently take the medication she was prescribed. Father testified that he was shocked to learn Mother tested positive for PCP, although he did know she had a history of using drugs. Father confirmed he has been unable to send his son financial support or gifts because of his incarceration. However, he sends cards, drawings, and letters to Ryan.

Father took classes, obtained certifications, and completed parenting classes, and at time of trial was waiting to hear his scores on his testing to obtain his GED. He was asked, but refused, to sign an affidavit of relinquishment, and said he would never sign one. He testified he sent forms to CPS for placement of Ryan with his cousin, "Adam."

4

Father further testified that he wants Ryan to be placed with Father's cousin Adam and his girlfriend of 14 years, until he is released from prison, which he testified could be as early as 2020 if he is granted parole. According to Father, he has already been denied parole twice. Father explained that after twenty-one years of crime, he is ready to make a change. He said that he will return to his previous job at a home repair company when he is released from prison and that he has family members with whom he and Ryan can stay.

### 2.  *Erika Kinney*

Erika Kinney, an investigative supervisor for the Department, testified that she received a priority one referral alleging neglectful supervision of Ryan in July 2018 by Mother. Specifically, the referral stated Mother was selling drugs and prostituting out of the home where Ryan lived. Additionally, there were allegations of physical abuse. When Kinney met with Mother, she learned that Mother had three other children who had been removed from her care. Mother also had served previously a 180-day sentence for child endangerment. Kinney testified that Mother agreed to take a drug test after the investigation began. The test returned positive for PCP and marijuana. Kinney confirmed Father was incarcerated when this investigation began.

### 3.  *Debra Lee*

Debra Lee, a conservatorship worker for the Department, testified that one of the first things she did when she received this case was to send Father a parenting packet explaining that his son was in the Department's custody and what would be required of Father. Lee testified that Father did not notify her of any potential placements for Ryan until December 2018. At that point, Father requested that his cousin, Adam, and Adam's girlfriend, "Amy," be considered as potential placements for Ryan. Lee testified  that she called Adam seven times and never got

a response. Four months later, in April 2019, Adam called Lee and told her that he was busy and would call her later. Lee said she never heard back from Adam. The first time Lee heard from Adam was at a hearing in this case two-and-half weeks before trial. Lee testified that she spoke with Adam, who said he was busy and did not get her messages.

After that hearing, Lee conducted a preliminary home study on Adam and Amy for potential placement. The Department's program director denied Adam and Amy's home study based on a prior CPS history of Amy which occurred in 2009. According to Debra Lee, Amy was charged with abandonment of her child, was incarcerated for three days, and the charges were dismissed. Lee testified that her supervisor denied the home study because of the 2009 Department investigation of Amy but admitted there had been no other referrals since that time.

The preliminary home study indicated that the couple had five other children in their home. The couple planned for Ryan to share a bedroom with one of his cousins. The family has an adequate number of bedrooms for all the children. The report indicated the couple was willing to become a permanent placement for Ryan.

Lee further testified that when Ryan came into the Department's care, he was having temper tantrums, night terrors, and suffering from an intense fear of the dark. Additionally, Ryan had a severe lice infestation. Since Ryan has been in foster care, his temper tantrums have decreased, along with his fear of the dark and his night terrors. Ryan's lice problem was remedied after a three-week course of treatment. Ryan has been attending daycare and going to a "Little Gym" class that he enjoys. He has been learning how to count and knows his colors. Ryan appears bonded with his foster parents and loves his family pets. Ryan enjoys helping to feed the dogs. The foster parents have been helping Ryan with his emotional issues

and have been researching to prepare themselves for any emotional issues he may suffer in the future as a result of the trauma he suffered in Mother's care. Lee testified that the foster parents are ready and willing to permanently adopt Ryan if given the opportunity.

Lee testified that she was concerned about Father's extensive history of violence. Lee confirmed she does not believe Father would be available for Ryan.

### 4. *Charlotte Murphy*

Charlotte Murphy, the court-appointed special advocate, testified that Ryan is thriving in his current placement. Murphy further testified that Ryan's communication has greatly improved, which also helps to minimize his temper tantrums. According to Murphy, Ryan's lice infestation was so severe he had to be taken to a special clinic for lice removal. Murphy further testified that Ryan is bonded, comfortable, and happy in his current foster placement.

Murphy opined that Ryan should stay in his current placement and that Mother's and Father's parental rights should be terminated. She testified that Father may possibly be incarcerated for another two years. Murphy testified she believed it would be detrimental to move Ryan from his foster family. Murphy explained that this would be disruptive because Ryan had already been left once by Mother and Father. Murphy testified that she was concerned about Father's history of domestic violence.

### 5. *Foster Mother*

Ryan's Foster Mother testified that when he came into her care he was diagnosed with "super lice" and they had to seek a three-week course of treatment at a specialized lice clinic. Ryan also suffered from extreme night terrors, which was remedied by the foster parents moving his bed into their bedroom, so he was

7

not left alone at night. The Foster Mother explained that she would rock him and sing to him to soothe him to sleep during that first month in order to get him to fall asleep in her bedroom. Ryan also suffered from temper tantrums that Foster Mother described as out of the ordinary for a two-year-old. Ryan would scream profanities and hit whatever was around him.

After three months of living with the foster family, Foster Mother moved Ryan into his own room where he is now able to sleep through the night. Ryan started potty-training recently and is doing "fantastic." Ryan goes to daycare three days a week and is enrolled in parent-child interactive gym classes with Foster Mother. Foster Mother takes Ryan to a neighborhood park at least five days a week where he socializes with other children. Foster Mother intends to enroll Ryan in play-therapy as soon as he turns three years old. Ryan is the only child currently living in the home with Foster Mother and Foster Father.

Foster Mother testified that Ryan occasionally asks about Mother and Father and that she encourages him to share his feelings. Foster Mother gave Ryan a picture of Mother and Ryan that Mother sent to her. Foster Mother testified that Ryan becomes sad when asking about Mother and Father.

Foster Mother testified that she has concerns about allowing Amy and Adam to care for Ryan because she does not believe they will protect him from Mother and Father. Foster Mother further testified that she intends to leave the lines of communication open with Mother and Father even if their parental rights are terminated. She would like Ryan to have a relationship with them while maintaining his safety. Foster Mother said she is also willing to create a relationship with Amy and Adam so they can get to know Ryan.

### 6. *Adam*

Father's cousin, Adam, testified that he and Amy have been together for fourteen years and have five children together. Adam opined that Ryan needs to be placed with his family because he needs to be with his blood relatives. Adam explained that he would have no problem protecting Ryan from Mother because he believes she was the "toxic one" in the relationship with Father. Adam disputed Debra Lee's testimony that she called him seven times and left voice messages regarding Ryan's situation. Adam explained that Lee called him one time and did not communicate the gravity of the situation. Adam further testified that Amy attempted to get custody of Ryan from the beginning of the case when he was being removed from his Mother's care. According to Adam, Amy was present when the Department was removing Ryan from Mother's care and requested to take him home. According to Adam, Amy was immediately denied custody of Ryan because Department investigators discovered she had a prior investigation. The couple did not follow up with the Department because they believed Mother was completing her services and doing whatever she could to get Ryan back.

Adam opined that Ryan might be emotionally and mentally affected "either way" whether he stays with the foster family or is placed with Adam and Amy, he will also suffer if he is denied the opportunity to be reunited with his blood relatives. Adam testified that he will do whatever it takes to make Ryan thrive in his home, including letting him sleep in a room with him and Amy, signing him up for soccer, and placing him in daycare. Adam said Ryan will share a room and sleep in his own bunk bed, or sleep with his youngest son. Adam takes all his children to their extracurricular activities, doctor's appointments, and prepares all their meals. He testified that he disciplines his own children by taking away WiFi

9

or phones, or by limiting other activities. Adam stated he would not allow Ryan to go anywhere without him or Amy and would be aware of their surroundings.

Adam told the court that if Father's parental rights are terminated and he is given custody of Ryan, he will not allow Father to take Ryan or have unsupervised visits with him. Adam further stated that if he is not given custody of Ryan, he would still like to see him and develop a relationship between his children and Ryan.

### 7. *Amy*

Amy, Adam's long-time girlfriend, testified that her children have spent time with Ryan and love him. Pictures of Ryan with his cousins and Father taken by Amy were entered into evidence. Ryan was shown being hugged by his cousins and sitting with Father at a restaurant.

Amy explained that on the day the Department removed Ryan from Mother's home, Mother called Amy crying and telling her that Ryan was being taken away. Amy immediately went over to Mother's house to see if she could qualify to take Ryan. The Department refused her because of the 2009 investigation.

Amy testified that she will protect Ryan from Mother and Father and apply for a restraining order if necessary. Amy testified that Ryan's safety comes first.

### C.   Trial Court's Ruling

The trial court announced it was terminating Mother's and Father's parental rights. On July 17, 2019, Father's rights were terminated under Family Code sections 161.001(b)(1)(D), (E), (O), and (Q). The trial court named the Department as Ryan's permanent managing conservator. Father appealed the trial court's ruling. Mother has not appealed.

## II.    ISSUES

In issues one through four, Father contends the evidence is legally and factually insufficient to support the termination of his parental rights under Tex. Fam. Code § 161.001(b)(1)(D), (E), (O), and (Q).  In his fifth issue, Father asserts that the evidence is legally and factually insufficient to support that termination is in the child's best interest.  Tex. Fam. Code § 161.001(b)(2).

## III.    ANALYSIS

### A.    Standards of Review

Involuntary termination of parental rights is a serious matter implicating fundamental constitutional rights.  *Holick v. Smith*, 685 S.W.2d 18, 20 (Tex. 1985); *In re D.R.A.*, 374 S.W.3d 528, 531 (Tex. App.—Houston [14th Dist.] 2012, no pet.).  Although parental rights are of constitutional magnitude, they are not absolute.  *In re A.C.*, 560 S.W.3d 624, 629 (Tex. 2018); *In re C.H.*, 89 S.W.3d 17, 26 (Tex. 2002) ("Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right.").

Due to the severity and permanency of terminating the parental relationship, Texas requires clear and convincing evidence to support such an order. *See* Tex. Fam. Code § 161.001; *In re J.F.C.*, 96 S.W.3d 256, 265-66 (Tex. 2002).  "Clear and convincing evidence" means "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established."  Tex. Fam. Code § 101.007; *In re J.F.C.*, 96 S.W.3d at 264.  This heightened burden of proof results in a "correspondingly searching standard of appellate review."  *In re A.C.*, 560 S.W.3d at 630; *see In re C.M.C.*, 273 S.W.3d 862, 873 (Tex. App.—Houston [14th Dist.] 2008, no pet.).

11

In reviewing legal sufficiency of the evidence in a parental termination case, we must consider all evidence in the light most favorable to the finding to determine whether a reasonable fact finder could have formed a firm belief or conviction that its finding was true. *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009). We assume that the fact finder resolved disputed facts in favor of its finding if a reasonable fact finder could do so, and we disregard all evidence that a reasonable fact finder could have disbelieved. *Id.*; *In re G.M.G.*, 444 S.W.3d 46, 52 (Tex. App.—Houston [14th Dist.] 2014, no pet.). However, this does not mean that we must disregard all evidence that does not support the finding. *In re D.R.A.*, 374 S.W.3d at 531. Because of the heightened standard, we also must be mindful of any undisputed evidence contrary to the finding and consider that evidence in our analysis. *Id.*

In reviewing the factual sufficiency of the evidence under the clear-and-convincing standard, we consider and weigh disputed evidence contrary to the finding against all the evidence favoring the finding. *In re A.C.*, 560 S.W.3d at 631; *see In re J.O.A.*, 283 S.W.3d at 345. "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.O.A.*, 283 S.W.3d at 345. We give due deference to the fact finder's findings and we cannot substitute our own judgment for that of the fact finder. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006).

## B.  Predicate Grounds

In a proceeding to terminate the parent-child relationship under Texas Family Code section 161.001, the petitioner must establish by clear and convincing evidence one or more acts or omissions enumerated under subsection (1) of section

12

161.001(b) and that termination is in the best interest of the child under subsection (2). Tex. Fam. Code § 161.001; *In re J.L.*, 163 S.W.3d 79, 84 (Tex. 2005).

In issues one through four, Father argues the evidence was legally and factually insufficient to support termination under all predicate grounds found by the trial court: sections 161.001(b)(1)(D), (E), (O), and (Q). If a trial court finds multiple predicate violations, we will affirm on any one violation that is established by clear and convincing evidence. *See In re T.N.F.*, 205 S.W.3d 625, 629 (Tex. App.—Waco 2006, pet. denied). Further, due to the significant collateral consequences of terminating parental rights under section 161.001(b)(1)(D) or (E),[2] "[a]llowing section 161.001(b)(1)(D) or (E) findings to go unreviewed on appeal when the parent has presented the issue to the court thus violates the parent's due process and due course of law rights." *In re N.G.*, 577 S.W.3d 230, 237 (Tex. 2019). Thus, when as here, a parent challenges predicate termination grounds under either subsection 161.001(b)(1)(D) or (E), or both of those subsections, we must address and detail our analysis under one of those subsections. *See id.* We will address the trial court's finding of endangerment under subsection E.

Termination of parental rights is warranted if the fact finder finds by clear and convincing evidence, in addition to the best-interest finding, that the parent has, "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child."

---

[2] Section 161.001(b)(1)(M) provides that parental rights may be terminated if clear and convincing evidence supports that the parent "had his or her parent-child relationship terminated with respect to another child based on a finding that the parent's conduct was in violation of Paragraph (D) or (E) or substantially equivalent provisions of the law of another state." *Id.* § 161.001(b)(1)(M). Thus, when parental rights have been terminated for endangerment under either section 161.001(b)(1)(D) or (E), that ground becomes a basis to terminate that parent's rights to other children.

13

Tex. Fam. Code § 161.001(b)(1)(E). "To endanger" means to expose a child to loss or injury or to jeopardize a child's emotional or physical health. *See In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996). A finding of endangerment under subsection E requires evidence that the endangerment was the result of the parent's conduct, including acts, omissions, or failures to act. *In re S.R.*, 452 S.W.3d 351, 361 (Tex. App.—Houston [14th Dist.] 2014, pet. denied). Termination under subsection E must be based on more than a single act or omission; the statute requires a voluntary, deliberate, and conscious course of conduct by the parent. *Id.* A court properly may consider actions and inactions occurring both before and after a child's birth to establish a course of conduct. *In re A.L.H.*, 515 S.W.3d 60, 91 (Tex. App.—Houston [14th Dist.] 2017, pet. denied).

While endangerment often involves physical endangerment, the statute does not require that conduct be directed at a child or that the child actually suffer injury; rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone. *Tex. Dep't of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987); *In re R.W.*, 129 S.W.3d 732, 738-39 (Tex. App.—Fort Worth 2004, pet. denied). A parent's conduct that subjects a child to a life of uncertainty and instability endangers the child's physical and emotional well-being. *In re F.E.N.*, 542 S.W.3d 752, 764 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *In re A.L.H.*, 515 S.W.3d at 92. Among the types of actions or omissions constituting evidence meeting this standard are criminal activity, convictions, and incarceration. *See In re V.V.*, 349 S.W.3d 548, 554 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). Evidence of criminal conduct, convictions, imprisonment, and their effects on a parent's life and ability to parent, may establish an endangering course of conduct. *In re S.M.*, 389 S.W.3d 483, 492 (Tex. App.—El Paso 2012, no pet.). Routinely subjecting children to the probability that

14

they will be left alone because their parent is in jail endangers children's physical and emotional well-being. *See Walker v. Tex. Dep't of Family and Protective Servs.*, 312 S.W.3d 608, 617 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). Imprisonment alone is not an endangering course of conduct but is a fact properly considered on the endangerment issue. *Boyd*, 727 S.W.2d at 533-34.

Also, criminal drug abuse and knowledge that the child's other parent abused drugs is an action or omission that is evidence of endangering conduct. "Drug abuse and its effect on the ability to parent can present an endangering course of conduct." *In re J.J.W.*, No. 14-18-00985-CV, 2019 WL 1827591 *6 (Tex. App.—Houston [14th Dist. April 25, 2019, pet. denied) (mem. op.).

Domestic violence and a propensity for violence are likewise evidence of endangerment. "Domestic violence, want of self-control, and propensity for violence may be considered as evidence of endangerment." *In re J.I.T.P.*, 99 S.W.3d 841, 845 (Tex. App.—Houston [14th Dist.] 2003, no pet.); *accord S.R.*, 452 S.W.3d at 361. Violence does not have to be directed toward the child or result in a final conviction—"Texas courts routinely consider evidence of parent-on-parent physical abuse in termination cases without specifically requiring evidence that the conduct resulted in a criminal conviction." *In re V.V.*, 349 S.W.3d at 556. As this court has noted, parents' criminal conduct that exposes them to the possibility of incarceration can negatively impact a child's living environment and emotional well-being. *In re S.M.L*, 171 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

In his brief, Father argues the evidence is insufficient to support the endangerment finding because he was the non-offending parent and he had no reason to believe Mother would resort back to drugs after he left for prison. In response, the Department argues that the evidence is sufficient because Father had

15

a long history of domestic violence, repeated incarcerations, drug offenses, and left Ryan with Mother whom he knew to have a history with the Department, a history of substance abuse, and untreated mental illness.

The clear and convincing evidence of Father's repeated criminal conduct, convictions, imprisonment, and their collective effect on his ability to parent a child establishes an endangering course of conduct. Father has subjected Ryan to a probability of being left alone because he is in jail, endangering Ryan's physical and emotional well-being. In addition to Father's history of incarceration for family violence against family members and Mother, Father has been charged with evading arrest, drug possession, burglary, criminal mischief, and assault causing bodily injury. By his own admission, Father has been in and out of jails and prisons for the last twenty-one years. Father estimated he has cumulatively spent fourteen of the last twenty-one years incarcerated. When parents are incarcerated, they are absent from the child's daily life and are unable to provide support, and when parents, like Father, repeatedly commit criminal acts that subject them to the possibility of incarceration, that can negatively impact a child's living environment and emotional well-being. *In re S.M.L.*, 171 S.W.3d 472, 479 (Tex. App.—Houston [14th Dist.] 2005, no pet.). Father's history of incarceration creates a risk that Ryan will continue to suffer from abandonment in Father's care, which could negatively impact his emotional well-being.

Additionally, the clear and convincing evidence of Father's multiple convictions for family violence establishes endangerment. The evidence presented at trial showed that Father has been charged with family violence assault on several occasions, including three counts of assault against ex-girlfriends and a charge of assault against Mother stemming from an incident while Mother was pregnant with Ryan. Such abusive or violent conduct can produce a home environment that

16

endangers a child's well-being, and such propensities are properly considered as evidence of endangerment. *In re J.I.T.P.*, 99 S.W.3d at 845. Despite pleading guilty to assaulting Mother, Father denied the assault occurred; however, it was within the purview of the trial court to determine the credibility of the witnesses, including Father. *See In re K.A.S.*, 131 S.W.3d 215, 229 (Tex. App.—Fort Worth 2004, pet. denied). Father has a record of violence against his domestic partners, including Mother. Further, to the extent the assault of Mother occurred while she was pregnant with Ryan, this also may constitute evidence of endangerment to Ryan *in utero*. In sum, Father's pattern of conduct provides this court with sufficiently clear and convincing evidence of endangering behavior.

While in prison, Father participated substantially to comply with the family service plan, worked toward completion of a GED, and appeared and testified at trial. Father even arranged for Ryan to live with his cousin Adam and Adam's girlfriend Amy. We also note the efforts Father has made to communicate with his son by sending cards and letters to Ryan, as well as the efforts by Adam and Amy to obtain custody of Ryan. In terminating Father's parental rights, however, the trial court reasonably noted Father's inability or unwillingness to safeguard Ryan's physical and emotional well-being. Father's incarceration left Ryan with Mother, whom Father acknowledged had lost her other three children, did not take medication for her conditions, and had a history of drug abuse. Father's lack of effort to ensure the well-being of his child—coupled with the evidence of criminal conduct and domestic violence—is sufficient to support a termination finding based on endangerment. *See In re Z.N.M.*, No. 14-17-00650-CV, 2018 WL 358480 at *6 (Tex. App.—Houston [14th Dist.] Jan. 11, 2018, no pet.) (mem. op.).

Considered in the light most favorable to the trial court's finding, the evidence is legally sufficient to support the trial court's determination that

termination of Father's parental rights was justified under Family Code section 161.001(b)(1)(E). Further, in view of the entire record, we conclude the disputed evidence is not so significant as to prevent the trial court from forming a firm belief or conviction that termination was warranted under section 161.001(b)(1)(E). Accordingly, we conclude the evidence is legally and factually sufficient to support the subsection E finding. We overrule Father's second issue.

Having concluded the evidence is legally and factually sufficient to support the trial court's finding under subsection E, we need not review the sufficiency of the evidence to support the subsections D, O, or Q findings. *See In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). We overrule Father's first, third, and fourth issues.

## C. Best Interest of the Child

We turn to Father's fifth issue, his legal and factual sufficiency challenges to the trial court's best-interest findings.

The best-interest inquiry is child-centered and focuses on the child's well-being, safety, and development. *In re A.C.*, 560 S.W.3d at 631. The trier of fact may consider several factors to determine the child's best interest, including: (1) the desires of the child; (2) the present and future physical and emotional needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the persons seeking custody; (5) the programs available to assist those persons seeking custody in promoting the best interest of the child; (6) the plans for the child by the individuals or agency seeking custody; (7) the stability of the home or proposed placement; (8) acts or omissions of the parent that may indicate the existing parent-child relationship is not appropriate; and (9) any excuse for the parents' acts or omissions. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976); *In re E.R.W.*, 528 S.W.3d 251, 266 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *see also* Tex. Fam. Code § 263.307(b) (listing factors to

consider in evaluating parents' willingness and ability to provide the child with a safe environment).

Courts apply a strong presumption that the best interest of the child is served by keeping the child with the child's natural parents, and it is the Department's burden to rebut that presumption. *In re D.R.A.*, 374 S.W.3d at 531. Prompt and permanent placement in a safe environment also is presumed to be in the child's best interest. Tex. Fam. Code § 263.307(a). A finding in support of "best interest" does not require proof of any unique set of factors, nor does it limit proof to any specific factors. *See Holley*, 544 S.W.2d at 371-72. Father argues the Department failed to pursue a "less-restrictive option" as opposed to parental-termination because a kinship placement was available. In reviewing the *Holley* factors, we review whether the evidence in the record supports parental-termination over placement with Amy and Adam as being in Ryan's best interest.

1.     *The desires of the child*

As to the first factor, neither party presented testimony regarding Ryan's desires. Ryan was just shy of three years old at the time of trial, and, therefore, too young to communicate his desires. When a child is too young to express his desires, the fact finder may consider that the child has bonded with the foster family, is receiving good care in the current placement, and has spent minimal time with a parent. *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). At the time of trial, Ryan had been living with his foster family for eleven months, from the time he was twenty-two months old. Ryan has never lived with Amy and Adam. Father was incarcerated when Ryan was only eight months old. The only evidence that Ryan bonded with Father was the testimony of Foster Mother, who stated that Ryan becomes sad when asking about Mother and Father, and Father remained absent from Ryan for most of the past two years. *See In re*

*L.G.R.*, 498 S.W.3d 195, 205 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (When children are too young to express their desires, the fact finder may consider that the children have bonded with the foster family, are well cared for by the foster family, and have spent minimal time with a parent). By all accounts, Ryan is thriving in the care of his foster parents. This factor supports the trial court's finding on best-interest.

2. *The present and future emotional and physical needs and present and future danger to the child*

With respect to factors two and three, the evidence supports the trial court's finding that Father engaged in conduct or knowingly placed Ryan with persons who engaged in conduct that endangered his physical or emotional well-being. Father admitted that he has been in and out of prison for the past twenty-one years, estimating he had spent fourteen years in prison since turning eighteen. He admitted to a variety of charges, including drugs, domestic violence, evading arrest, and burglary. Father pled guilty to assaulting Mother when she was pregnant with Ryan. Moreover, evidence supporting termination under the grounds listed in section 161.001(b)(1) can also be considered in support of a finding that termination is in the best interest of the child. *See In re C.H.*, 89 S.W.3d at 27. Furthermore, a fact-finder may infer that past conduct endangering the well-being of a child may recur in the future if the child is returned to the parent. *In re A.J.E.M.-B.*, No.14-14-00424-CV, 2014 WL 5795484 at *16 (Tex. App.—Houston [14th Dist.] Nov. 6, 2014, no pet.) (mem. op.). Despite Father's pronouncements that he is changing his life for the better, he lacks any history of law-abiding behavior that could have given the trial court assurance he will change his ways. These two factors support the trial court's finding of termination.

### 3.    *Parenting Ability of Father and Programs Available to Assist Father*

As to factors four and five, Father has completed some parenting classes while incarcerated; however, this does not negate Father's history of irresponsible choices.   It is undisputed that Father currently resides in prison and has been denied parole twice.   Father has been in and out of prison for twenty-one years. His criminal conduct includes violent criminal activity, including assaulting Mother while pregnant with Ryan.   He also left Ryan with Mother's care when he knew she had untreated mental health issues and a history with the Department. The trial court could have concluded that Father lacked insight as to Ryan's physical and emotional needs, demonstrated poor judgment in the past, and lacks the ability and parenting skills to provide Ryan with adequate care.  *See D.O.*, 851 S.W.2d at 358.  These two factors support the trial court's finding of termination.

### 4.    *Plans for the Child by the Individual or by the Agency Seeking Custody and the Stability of the Home or Proposed Placement*

Factors six and seven address the placement of the child.   Texas courts recognize as a paramount consideration in the best-interest determination the children's need for a "stable, permanent home." *See In re K.C.*, 219 S.W.3d 924, 927 (Tex. App.—Dallas 2007, no pet.). Therefore, evidence about the present and future placement of the child is relevant to the best-interest determination. *See In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002). The evidence presented at trial shows Ryan has a healthy routine and has overcome significant challenges through the support of his foster family. The record demonstrates the home is stable and loving. If Ryan is placed with Amy and Adam prior to Father being released from prison, he will undergo an immediate disruption in his current routine and again when Father is released. Father testified about numerous relatives that would allow he and Ryan to "stay" with them but offered no permanent solutions. Father is unable to demonstrate he can provide the stability Ryan needs, when his history

is replete with incarceration after incarceration. These two factors weigh in favor of the trial court's finding on best-interest.

5. *Acts or Omissions of Father which may Indicate that the Existing Parent-Child Relationship is Not a Proper One*

As to factor eight, the evidence is undisputed that Father has a history of criminal conduct, including drugs, burglary, and several instances of domestic violence. He admittedly has been in and out of jail and was incarcerated at the time of trial. Father's incarceration has resulted in Ryan being left in Mother's care, whom he knew to have untreated mental health issues and a prior history with the Department. This factor weighs in favor of the trial court's decision of termination.

6. *Excuses for Father's Acts or Omissions*

For the ninth factor, Father does not offer an excuse. As such, this factor weighs in favor of termination.

Viewing the evidence in the light most favorable to the judgment for our legal-sufficiency analysis and all of the evidence equally for our factual-sufficiency analysis, we conclude that a reasonable fact finder could have formed a firm belief or conviction that termination of Father's parental rights was in Ryan's best interest. *See* Tex. Fam. Code § 161.001(b)(2). We overrule Father's fifth issue.

## IV. CONCLUSION

The evidence is legally and factually sufficient to support the predicate termination finding under subsection E. And, based on the evidence presented, the trial court reasonably could have formed a firm belief or conviction that terminating Father's parental rights was in Ryan's best interest. We affirm the judgment of the trial court.

22

We affirm the decree terminating Father's parental rights and naming the Department managing conservator.


/s/    Margaret "Meg" Poissant
Justice


Panel consists of Justices Wise, Jewell, and Poissant.